**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON SUBSCRIBING TO POLICY NOS. B0507 N17FA23160 AND B0507 N17FA24460, FORGE UNDERWRITING LTD., AND PARTNER RE IRELAND INSURANCE DAC | : : : : : : : | Case. No. 1:21-cv-6505 |
| Plaintiffs, | : : | |
| v. | : : | |
| AMTRUST FINANCIAL SERVICES, INC., | : : | |
| Defendant. | : : | |

**COMPLAINT**

1.       This is an action pursuant to 28 U.S.C. §§ 1332, 2201 and 2202 for a declaration that plaintiffs, Certain Underwriters at Lloyds, London, subscribing to Policy Nos. B0507 N17FA23160 and B0507 N17FA24460, Forge Underwriting Ltd. ("Forge"), and Partner Re Ireland Insurance dac ("Partner Re") (collectively, "Underwriters"), have no obligation to provide indemnity coverage to AmTrust Financial Services, Inc. ("AmTrust") in connection with a consolidated shareholder action styled, *In re AmTrust Financial Services, Inc. Stockholder Litigation,* Case No. 2018-0396-AGB,  (the "Underlying Action"), against AmTrust and reported to Underwriters under Excess Directors & Officers Liability and Company Reimbursement Insurance Policy No. B0507 N17FA23160  (the "Fourth Excess Policy") and Excess Directors & Officers Liability and Company Reimbursement Insurance Policy No. B0507 N17FA24460 (the "Fifth Excess Policy").

2.       Underwriters seek a declaration that the Underlying Action submitted under the Fourth Excess Policy and the Fifth Excess Policy (collectively, the "Underwriters' Excess

Policies") does not fall within the coverage provided by the Underwriters' Excess Policies.

3.     An actual justiciable controversy exists between Underwriters and AmTrust.

## PARTIES

4.     Underwriters include certain syndicates at Lloyd's of London subscribing to Underwriters' Excess Policies, including Chubb Global Markets Syndicate 2488, Aspen Syndicate 4711, Barbican Consortium 9562 (which is comprised of the underwriting members of Lloyd's Syndicate 1884 for and on behalf of all of the underwriting members of Lloyd's Syndicate 1955 ("Premia Syndicate 1884"), MS Amlin Syndicate 2001, and Everest Syndicate 2786), the underwriting members of Lloyd's Syndicate 3500 for and on behalf of all of the underwriting members of Lloyd's Syndicate 4000 for the underwriting years 2018 and prior ("Riverstone Syndicate 3500") and Talbot Syndicate 1183 (collectively, the "Lloyd's Syndicates"), which are organized and existing under the laws of the United Kingdom, with their principal places of business in London, England.  None of the members of the Lloyd's Syndicates are citizens of New York or Delaware.

5.     Chubb Global Markets Syndicate 2488 is an unincorporated association whose only member is a foreign corporation registered under the laws of England and Wales with its principal place of business located in London, England.  Chubb Global Markets Syndicate 2488 is responsible for 21.3965% of the Fourth Excess Policy and 17.9% of the Fifth Excess Policy.

6.     Aspen Syndicate 4711 is an unincorporated association whose only member is a foreign corporation registered under the laws of England and Wales with its principal place of business located in London, England.  Aspen Syndicate 4711 is responsible for 21.3901% of the Fourth Excess Policy and 17.9% of the Fifth Excess Policy.

7.     Riverstone Syndicate 3500 is an unincorporated association whose members are all

foreign corporations with their principal places of business located outside the United States. Riverstone Syndicate 3500 is responsible for 10.6918% of the Fourth Excess Policy and 13.962% of the Fifth Excess Policy.

8.     Barbican Consortium 9562, comprised of the three following syndicates, is responsible for 14.4398% of the Fourth Excess Policy and 7.5% of the Fifth Excess Policy.

    a.  Premia Syndicate 1884 is an unincorporated association whose members are all foreign corporations with their principal places of business located outside the United States.  Premia Syndicate 1884 is responsible for 66.66% of Barbican Consortium 9562's portion of the risk.

    b.  MS Amlin Syndicate 2001 is an unincorporated association whose members are all foreign corporations with their principal places of business located outside the United States. MS Amlin Syndicate 2001 is responsible for 16.67% of Barbican Consortium 9562's portion of the risk.

    c.  Everest Syndicate 2786 is an unincorporated association whose members are all foreign corporations with their principal places of business located outside the United States.  Everest Syndicate 2786 is responsible for 16.67% of Barbican Consortium 9562's portion of the risk.

9.     Talbot Syndicate 1183 is an unincorporated association whose members are all foreign corporations with their principal places of business located outside the United States. Talbot Syndicate 1183 is responsible for 10.6918% of the Fourth Excess Policy. Talbot Syndicate 1183 does not participate on the Fifth Excess Policy.

10.     Forge is a United Kingdom private limited company with its principal place of business at London, England. Forge is responsible for 21.39% of the Fourth Excess Policy and

17.915% of the Fifth Excess Policy.

11.     Partner Re is an Ireland designated activity company with its principal place of business at Dublin, Ireland.  Partner Re acts as the security for Forge.

12.     Upon information and belief, AmTrust is a Delaware corporation with its principal place of business in New York, New York. The policies at issue in this action were issued to AmTrust in New York.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §1332 based on complete diversity of the parties, and because the amount in controversy set forth in this complaint exceeds the sum of $75,000, exclusive of costs.

14.     Venue is proper pursuant to 28 U.S.C. §1391 on either of the following alternative grounds: (a) a substantial part of the events giving rise to the instant claim for declaratory relief occurred in this district, including, without limitation, that upon information and belief, the policies were issued in New York; and (b) the defendant is subject to the Court's personal jurisdiction.

## UNDERWRITERS EXCESS POLICIES

## THE FOURTH EXCESS POLICY

15.     Underwriters issued the Fourth Excess Policy to AmTrust for the policy period October 21, 2017 to October 21, 2018 (the "2017-2018 Policy Period"). A true and correct copy of the Fourth Excess Policy is attached hereto as **Exhibit A** and incorporated by this reference as though fully set forth herein.  The Fourth Excess Policy has a $15 million maximum aggregate Limit of Liability, excess of $25 million in underlying limits provided by primary Executive and Corporate Securities Liability Insurance Policy No. US0008794DO17A (the "Primary Policy") and three underlying excess policies, nos. DOC 1074701-00, MNN626501/01/01/2017, and

B0507N17FA23130 issued by, respectively, Zurich American Insurance Company, AXIS Insurance Company and Lloyd's Syndicate HIS 33 (together with the Primary Policy, the "Followed Policies").  A true and correct copy of the Primary Policy is attached hereto as **Exhibit B** and incorporated by this reference as though fully set forth herein.

16.     The Choice of Law and Risk Details of the Fourth Excess Policy state that it "shall be governed by and construed in accordance with the law of New York and each party agrees to submit to the exclusive jurisdiction of the courts of the United States of America."

17.     Except as otherwise provided in the Fourth Excess Policy, the Fourth Excess Policy is subject to the terms, conditions and limitations as are contained in the Primary Policy and the other Followed Policies. The Fourth Excess Policy provides claims made coverage and only applies "to any Claim first made against the Insureds during the Policy Period provided that such Claim is reported in writing to the underwriters pursuant to the policy provisions."

18.     The Insuring Clause of the Fourth Excess Policy provides that "coverage hereunder shall attach only after all of the Underlying Limits have been exhausted through payments by, or on behalf of, or in place of the insurers of the Underlying Insurance of amounts under the Underlying Insurance."

19.     The Fourth Excess Policy includes a Retroactive Date Inception Endorsement (the "Fourth Excess Retroactive Date Endorsement") that "excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving: (1) any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01 am Local Time on 21st October 2017, (2) any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts, or (3) any other conduct

occurring on or subsequent to the date stated in (1) above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions."

### THE FIFTH EXCESS POLICY

20.     Underwriters issued the Fifth Excess Policy to AmTrust for the 2017-2018 Policy Period.  A true and correct copy of the Fifth Excess Policy is attached hereto as **Exhibit C** and incorporated by this reference as though fully set forth herein.  The Fifth Excess Policy provides a maximum aggregate Limit of Liability of $10 million each Claim, excess of $40 million in underlying limits provided by the Followed Policies and the Fourth Excess Policy.

21.     The Choice of Law and Risk Details provision of the Fifth Excess Policy state that it "shall be governed by and construed in accordance with the law of New York and each party agrees to submit to the exclusive jurisdiction of the courts of the United States of America."

22.     Except as otherwise provided in the Fifth Excess Policy, the Fifth Excess Policy is subject to the terms, conditions and limitations as are contained in the Primary Policy, the other Followed Policies and the Fourth Excess Policy.  The Fifth Excess Policy provides claims made coverage and only applies "to any Claim first made against the Insureds during the Policy Period provided that such Claim is reported in writing to the underwriters pursuant to the policy provisions."  Item 6 of the Declarations lists the Followed Policies and the Fourth Excess Policy.

23.     The Insuring Clause of the Fifth Excess Policy provides that "coverage hereunder shall attach only after all of the Underlying Limits have been exhausted through payments by, or on behalf of, or in place of the insurers of the Underlying Insurance of amounts under the Underlying Insurance."

24.     The Fifth Excess Policy includes a Retroactive Date Endorsement (the "Fifth

Excess Retroactive Date Exclusion" and, together with the Fourth Excess Retroactive Date Exclusion, the "Excess Retroactive Date Exclusions") that "excludes any Loss or Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving: 1. any Wrongful Act actually or allegedly committed or any conduct actually or allegedly undertaken prior to 12.01 am Local Time on 21st October 2017, 2. any other Wrongful Act occurring on or subsequent to the date stated in 1. above which, together with a Wrongful Act occurring prior to such date, would constitute interrelated Wrongful Acts, or 3. any other conduct occurring on or subsequent to the date stated in 1. above, together with conduct occurring prior to such date, have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions."

## **THE PRIMARY POLICY**

25.     The underlying Primary Policy provides directors and officers liability coverage under the following insuring agreements in Section I of the Primary Policy:

> [Insuring Agreement] (A): The Insurer shall pay on behalf of the Insured Persons Loss resulting from a Claim first made against the Insured Persons during the Policy Period for a Wrongful Act, except for Loss which the Company is permitted or required to pay on behalf of the Insured Persons as indemnification.

> [Insuring Agreement] (B): The Insurer shall pay on behalf of the Company Loss resulting from a Claim first made against the Insured Persons during the Policy Period for a Wrongful Act to the extent the Company is required or permitted to pay on behalf of the Insured Persons as indemnification.

> [Insuring Agreement] (C): The Insurer shall pay on behalf of the Company Loss resulting solely from any Securities Claim first made against the Company during the Policy Period for a Wrongful Act.

> [Insuring Agreement] (D): The Insurer shall pay on behalf of the Insured Persons Defense Expenses resulting from an Interview, except for Defense Expenses which the Company is permitted or required to pay on behalf of the Insured Persons as indemnification.

> [Insuring Agreement] (E): The Insurer shall pay on behalf of the Company Defense

Expenses incurred by the Insured Persons resulting from an Interview to the extent the Company is required or permitted to pay on behalf of the Insured Persons such Defense Expenses.

[Insuring Agreement] (F): The Insurer shall pay on behalf of the Company Defense Expenses incurred by the Company resulting from any Investigation Demand first made during the Policy Period.

26.     Section II(C) of the Primary Policy defines "Claim" in relevant part as "any civil, criminal, administrative or regulatory proceeding commenced by: (a) service of a complaint or similar pleading."

27.     "Wrongful Act" is defined in Section II.(U) of the Primary Policy in relevant part as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by an Insured Person while acting in his or her capacity as such or due to his or her status as such."

28.     "Loss" is defined in Section II.(O) of the Primary Policy as "damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiplied damages, where insurable by law) that any Insured is legally obligated to pay and Defense Expenses, including that portion of any settlement which represents the claimant's attorneys' fees." Section II.(O) further provides that Loss does not include, among other things, (1) any amount which is uninsurable under the laws pursuant to which the Primary Policy is construed; and (2) any amount which represents or is substantially equivalent to an increase in the consideration paid, or proposed to be paid, by the Company in connection with its purchase of any securities or assets of any person, group of persons, or entity.

29.     The Primary Policy (and Underwriters' Excess Policies by virtue of their incorporation of the Primary Policy's terms, conditions, limitations, exclusions, and endorsements) contain provisions that establish when a "Claim" is deemed first made and exclusions that

reinforce the fact that the Primary Policy and Underwriters' Excess Policies afford coverage only for "Claims" first made during the Policy Period.

30.     Section VI.(B) of the Primary Policy (the "Single Claim Provision") states that all "Claims" arising from the same "Interrelated Wrongful Acts" shall be deemed to constitute a single "Claim" and shall be deemed to have been made at the earliest of the time at which the earliest such "Claim" is made or deemed to have been made pursuant to Section VI.(A) of the Primary Policy.

31.     "Interrelated Wrongful Act" is defined in Section II.(K) of the Primary Policy to mean any "Wrongful Acts" based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions, or events.

32.     Endorsement No. 5 to the Primary Policy (the "Prior Act Exclusion") provides that no coverage will be available for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty, or Wrongful Act committed or allegedly committed prior to October 21, 2017.

33.     Endorsement No. 6 to the Primary Policy (the "Specific Matter Exclusion") provides that no coverage shall be available for any Loss in connection with: (1) certain Claims, notices, events, investigations or actions (hereinafter "Events") set forth in Endorsement No. 6; (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any Event; or (b) any Claim arising from any Event; or (iii) any Wrongful Act, underlying facts, circumstances, acts or omissions in any way relating to any Event. Endorsement No. 6 of the Primary Policy further provides that no coverage shall be available under the Primary Policy for

9

any Loss in connection with: (A) any restatement, retraction, amendment or revision of in part or in whole: (1) any document or statement filed or submitted or required to be filed or submitted with the Securities and Exchange Commission or any other similar federal, state or local agency; or (ii) any written or oral statement made regarding the assets, revenues, sales or financial conditions of the Company, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Event or the resolution of said Event; and (B) any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an Interrelated Wrongful Act, regardless of whether or not such Claim involved at the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

34.     Section III.(B)(1) of the Primary Policy (the "Prior Litigation Exclusion") provides that no coverage shall be available for any Claim made against an Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, or Wrongful Act underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration against any Insured which was brought prior to the Pending and Prior Litigation Date (i.e., October 21, 2017).

35.     Section III.(B)(2) of the Primary Policy (the "Prior Notice Exclusion") provides that no coverage shall be available for any Claim made against an Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date of this Policy (i.e., October 21, 2017) was the subject of notice given under any other Management Liability Policy, Directors and Officers liability policy or similar policy.

36.     Endorsement No. 16 to the Primary Policy (the "Subsequent Acts Exclusion")

provides that no coverage will be available for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act committed or allegedly committed on or after November 29, 2018.

37.     Pursuant to Section II.(U) of the Primary Policy, both the Primary Policy and Underwriters' Excess Policies only provide coverage for Claims against an Insured for a Wrongful Act that is committed by an Insured in their capacity as such, that is, as a "Director or Officer" of AmTrust.

## THE DERIVATIVE ACTIONS FILED PRIOR TO THE POLICY PERIOD

38.     AmTrust's directors (the "D&Os") were sued in three derivative lawsuits filed prior to October 21, 2017, the date Underwriters' Excess Policies incepted (the "Derivative Actions").

39.     In April 2015, Cambridge Retirement System ("Cambridge"), an AmTrust stockholder, commenced a derivative action in the Delaware Chancery Court on behalf of AmTrust against Barry Zyskind, George Karfunkel, Leah Karfunkel, Abraham Gilkowitz, Susan Fisch, Donald DeCarlo, and others. A copy of the public redacted version of the Verified Amended Stockholder Derivative Complaint is attached hereto as **Exhibit D.**

40.     Cambridge alleged that the defendants breached their fiduciary duties to AmTrust by either usurping or permitting others to usurp a valuable corporate opportunity concerning the acquisition of Tower Insurance Group.

41.     In April 2017, David Shaev Profit Sharing Plan ("Shaev"), an AmTrust stockholder, commenced a derivative action in the Supreme Court of New York, New York against Barry Zyskind, Donald DeClaro, Susan Fisch, Abraham Gulkowitz, and others. A copy of the Complaint is attached hereto as **Exhibit E.**

42.     Shaev alleged AmTrust's financial statements were erroneous, false, and

misleading.

43.     In June 2017, another AmTrust stockholder, Pompano Beach Police & Firefighters Retirement System ("Pompano"), commenced a derivative action in the Delaware Chancery Court on behalf of AmTrust against Barry Zyskind, George Karfunkel, Leah Karfunkel, Abraham Gulkowitz, Susan Fisch, and Donald DeCarlo. A copy of the Verified Second Amended Stockholder Derivative Complaint is attached hereto as **Exhibit F.**

44.     Pompano alleged that the defendants breached their fiduciary duties to AmTrust in connection with financial fraud that led to underreported revenues, income, and other important metrics and that resulted in the Company having to restate nearly three years' worth of financials in 2017.

## THE UNDERLYING ACTION

45.     On or about March 1, 2018, AmTrust announced that its controlling shareholders, the "Karfunkel-Zyskind Family" comprised of Barry Zyskind, George Karfunkel, and Leah Karfunkel, had negotiated a deal to take the Company private with the assistance of a private equity firm, Stone Point Capital, LLC. After learning of the proposed go-private transaction and recognizing that their then-pending Derivative Actions would be moot after such transaction, Cambridge and Pompano both filed direct stockholder actions against AmTrust's directors and officers on June 4, 2018 and May 31, 2018, respectively. In their direct actions, Cambridge and Pompano generally re-alleged the wrongdoing alleged in their Derivative Actions and challenged the proposed go-private transaction on the basis that the proposed purchase price was unfair and the special take-private committee failed to assign appropriate value to the Derivative Actions.

46.     AmTrust's shareholders voted to approve the deal on June 21, 2018, and the go-private transaction closed on November 29, 2018. The direct actions filed in May and June 2018

were consolidated and are referred to herein as the "Underlying Action." A copy of the Amended Verified Consolidated Class Action Complaint in the Underlying Action is attached hereto as **Exhibit G.**

47.     The plaintiffs in the Underlying Action allege the defendants took advantage of the downturn in stock price caused by the wrongdoing at issue in the Derivative Actions (and the revelation thereof) to force through an improper go-private merger transaction that allowed the defendants to reclaim complete ownership of AmTrust at below fair market value. The plaintiffs allege that the go-private transaction is the culmination of the Karfunkel-Zyskind Family's efforts that started with the improper Tower Insurance Group transaction in 2014, continued with the Company's misleading financial statements and restatements in early 2017, and ultimately allowed the Karfunkel-Zyskind Family to purchase the Company's stock at below market value price that benefitted the Family's interests above the other stockholders' interests.

## UNDERWRITERS' COVERAGE POSITION

48.     By letter of January 29, 2020, Underwriters denied coverage for the Underlying Matter (the "Denial Letter") and reserved their rights under Underwriters' Excess Policies.  A copy of the January 29, 2020 letter is attached hereto as **Exhibit H.**

49.     Underwriters denied coverage for the Underlying Matter based on the following grounds:

> a.  The Underlying Action is based upon, arises out of, results from, and involves alleged breaches of fiduciary duties related to the acquisition of Tower Insurance Group and the underreporting of revenues, income, and other financial metrics resulting in certain financial restatements that were the subject of the Derivative Actions filed in 2015 and 2017. As such, pursuant to the Primary Policy's Single Claim provision, the Underlying Action and the Derivative Actions constitute a single Claim deemed first made when the Derivative Actions were first made, that is, in 2015 and 2017 prior to the inception of Underwriters' Excess Policies, and Underwriters' Excess Policies consequently afford no coverage for the Underlying Action.

b. Coverage for the Underlying Action is precluded by the Primary Policy's Prior Act Exclusion and the Excess Retroactive Date Exclusions in that it is based upon, arises out of, directly or indirectly results from, in consequence of, or in any way involves wrongdoing and conduct that occurred prior to the date Underwriters' Excess Policies incepted, October 21, 2017. In this regard, the Amended Verified Consolidated Class Action Complaint in the Underlying Action devotes more than 40 pages to a detailed discussion of the wrongdoing and other conduct previously alleged in the Derivative Actions, and the plaintiffs allege this conduct was intended to lower the price of the Company below market value in an effort to help the Insureds profit from the eventual go-private transaction.

c. Coverage for the Underlying Action is precluded by the Primary Policy's Specific Matter Exclusion. That Exclusion lists the Derivative Actions (as well as other securities lawsuits related to the same alleged wrongdoing), and the Underlying Action involves the same or at least related facts, circumstances, acts, and omissions underlying and at issue in the specifically excluded Derivative Actions.

d. Coverage for the Underlying Action is precluded by the Primary Policy's Prior Litigation Exclusion. The Underlying Action is based upon, arises out of, results from, and involves facts, circumstances, situations, transactions, events, and Wrongful Acts underlying or alleged in the Derivative Actions that were brought prior to the Pending and Prior Litigation Date of October 21, 2017.

e. Coverage for the Underlying Action is precluded by the Primary Policy's Prior Notice Exclusion. The Underlying Action is based upon, arises out of, results from, and involves facts, circumstances, situations, transactions, events, and Wrongful Acts underlying or alleged in prior Claims (the Derivative Actions) first made against the Insureds prior to October 21, 2017 and for which the Insureds have sought coverage under other prior insurance policies.

f. Coverage for the Underlying Action is precluded by the Subsequent Acts Exclusion in that it is based upon, arises out of, directly or indirectly results from, is in consequence of, or in any way involves Wrongful Acts committed on or after November 29, 2018.

g. Both the Primary Policy and Underwriters' Excess Policies provide coverage only for Claims against an Insured for a Wrongful Act that is committed by an Insured in their capacity as such, that is, as a Director or Officer of AmTrust. Coverage for the Underlying Action is precluded to the extent Defendants have been sued for acts undertaken in their uninsured capacity as stockholders and purchasers of AmTrust.

h. Both the Primary Policy and Underwriters' Excess Policies do not afford coverage for uncovered loss such as restitution or disgorgement of ill-gotten gains or any other sums that do not constitute covered or insurable Loss under the Policies or

applicable law.

## COUNT I – DECLARATORY JUDGMENT
## AS TO APPLICATION OF THE SINGLE CLAIM PROVISION

50.     Underwriters adopt by reference and reallege paragraphs 1 through 51, as though set forth in full herein.

51.     An actual, present, and justiciable controversy exists concerning whether the Underlying Action and the Derivative Actions constitute a single Claim deemed first made when the Derivative Actions were made, that is, in 2015 prior to the inception of Underwriters' Excess Policies.

52.     Underwriters request that the Court declare that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Single Claim Provision and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

## COUNT II – DECLARATORY JUDGMENT
## AS TO THE PRIOR ACT EXCLUSION

53.     Underwriters adopt by reference and reallege paragraphs 1 through 54, as though set forth in full herein.

54.     An actual, present, and justiciable controversy exists concerning whether the Prior Act Exclusion precludes coverage for the Underlying Action under Underwriters' Excess Policies.

55.     Underwriters request that the Court declare that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Prior Act Exclusion and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

## COUNT III – DECLARATORY JUDGMENT
## AS TO THE EXCESS RETROACTIVE DATE EXCLUSIONS

56.    Underwriters adopt by reference and reallege paragraphs 1 through 57, as though set forth in full herein.

57.    An actual, present, and justiciable controversy exists concerning whether the Excess Retroactive Date Exclusions preclude coverage for the Underlying Action under Underwriters' Excess Policies.

58.    Underwriters request that the Court declare that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Excess Retroactive Date Exclusions and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

## COUNT IV – DECLARATORY JUDGMENT
## AS TO THE SPECIFIC MATTER EXCLUSION

59.    Underwriters hereby adopt by reference and reallege the allegations contained in paragraphs 1 through 60 of this Complaint as if fully set forth herein.

60.    An actual, present, and justiciable controversy exists concerning whether the Specific Matter Exclusion precludes coverage for the Underlying Action under Underwriters' Excess Policies.

61.    Underwriters request that the Court declare that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Specific Matter Exclusion and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

16

## COUNT V – DECLARATORY JUDGMENT
## AS TO THE PRIOR LITIGATION EXCLUSION

62.     Underwriters hereby adopt by reference and reallege the allegations contained in paragraphs 1 through 63 of this Complaint as if fully set forth herein.

63.     An actual, present, and justiciable controversy exists concerning whether the Prior Litigation Exclusion precludes coverage for the Underlying Action under Underwriters' Excess Policies.

64.     Underwriters request that the Court declare that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Prior Litigation Exclusion and, as a result Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

## COUNT VI – DECLARATORY JUDGMENT
## AS TO THE PRIOR NOTICE EXCLUSION

65.     Underwriters hereby adopt by reference and reallege the allegations contained in paragraphs 1 through 66 of this Complaint as if fully set forth herein.

66.     An actual, present, and justiciable controversy exists concerning whether the Prior Notice Exclusion precludes coverage for the Underlying Action under Underwriters' Excess Policies.

67.     Underwriters request that the Court declare that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Prior Notice Exclusion and, as a result Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

## COUNT VII – DECLARATORY JUDGMENT
## AS TO THE SUBSEQUENT ACTS EXCLUSION

68.    Underwriters hereby adopt by reference and reallege the allegations contained in paragraphs 1 through 69 of this Complaint as if fully set forth herein.

69.    An actual, present, and justiciable controversy exists concerning whether the Subsequent Acts Exclusion precludes coverage for the Underlying Action under Underwriters' Excess Policies.

70.    Underwriters request that the Court declare that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Subsequent Acts Exclusion and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

## COUNT VIII – DECLARATORY JUDGMENT
## AS TO UNINSURED CAPACITY

71.    Underwriters hereby adopt by reference and reallege the allegations contained in paragraphs 1 through 72 of this Complaint as if fully set forth herein.

72.    An actual, present, and justiciable controversy exists concerning whether all or certain of the D&Os were sued in the Underlying Action for acts undertaken in an uninsured capacity.

73.    Underwriters request that the Court declare that there is no coverage, in whole or in part, for the Underlying Action under Underwriters' Excess Policies insofar as all or certain of the D&Os were sued in the Underlying Action for acts undertaken in an uninsured capacity.

## COUNT IX – DECLARATORY JUDGMENT
## AS TO UNCOVERED LOSS

74.    Underwriters hereby adopt by reference and reallege the allegations contained in paragraphs 1 through 75 of this Complaint as if fully set forth herein.

75.     An actual, present, and justiciable controversy exists concerning whether all or certain damages sought in the Underlying Action are covered Loss under the Primary Policy, Underwriters' Excess Policies, and/or at law.

76.     Underwriters request that the Court declare that it is not obligated to indemnify AmTrust for any portions of a settlement or judgment entered in the Underlying Action that constitute uncovered loss under the Primary Policy, Underwriters' Excess Policies, and/or at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Underwriters pray that the Court enter an Order:

1. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Single Claim Provision and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment;

2. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Prior Act Exclusion and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment;

3. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Excess Retroactive Date Exclusions  and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment.

4. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Specific Matter Exclusion and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment;

5. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Prior Litigation Exclusion and, as a result Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment;

6. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Prior Notice Exclusion and, as a result Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment;

7. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies by virtue of the Subsequent Acts Exclusion and, as a result, Underwriters are not obligated to indemnify AmTrust for any Loss it incurs in connection with the Underlying Action, including but not limited to defense costs, or for any settlement or judgment;

8. declaring that there is no coverage for the Underlying Action under Underwriters' Excess Policies insofar as all or certain of the D&Os were sued in the Underlying Action for acts undertaken in an uninsured capacity;

9. declaring that Underwriters are not obligated to indemnify AmTrust for any portions of a settlement or judgment entered in the Underlying Action that constitute uncovered loss under the Primary Policy, Underwriters' Excess Policies, and/or at law;

10. awarding Underwriters their costs, expenses, and attorney fees; and

11. awarding Underwriters all other relief the Court deems just and equitable.


Dated:  New York, New York
        July 30, 2021

By: /s/ Edward J. Kirk_____
    Edward J. Kirk (SDNY No. EK1627)
    Scott W. Schwartz (SDNY No. SS6665)
    CLYDE & CO US LLP
    The Chrysler Building
    405 Lexington Avenue
    New York, New York 10174
    (212) 710-3900

    *Attorneys for Plaintiffs Certain*
    *Underwriters at Lloyds, London Subscribing*
    *To Policy Nos. B0507 N17FA23160 and*
    *B0507 N17FA24460, Forge Underwriting*
    *Ltd., and Partner Re Ireland Insurance dac*